UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03CV-32-H

CORRY BURKE, et al.                                                            PLAINTIFF

v.

U-HAUL INTERNATIONAL, INC., et al.                                            DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Several pending motions concern the admissibility of expert witness testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The U-Haul Defendants have filed two: (1) to exclude the opinions and vehicle tests of the Plaintiffs' expert, Robert Anderson: and to exclude the opinion, reports and findings of the Plaintiffs' expert, Larry Barone.  The Burke family,[1] have moved to exclude certain opinions of U-Haul experts James Fait and Tyler Kress, Ph.D., along with the results obtained by the "drive through" testing of U-Haul's experts, James Schultz and Peter Broen.  In addition, U-Haul has moved for partial summary judgment based on the hoped for results of its *Daubert* motions.  All of these motions are fully briefed.

Although the motions raise serious questions about some of the proposed testimony, the Court finds no basis for excluding any witness.

---

[1]  The Plaintiffs are Corry Burke and her husband, Christopher Burke, individually and as next friend of their minor son, Ryan Burke.

I.

The lawsuit arises out of a motor vehicle accident that occurred in Kentucky on Interstate 65 on October 29, 2002.  The Burkes were traveling that day from Indianapolis to West Palm Beach, Florida.  Christopher Burke was driving the family's Ford Explorer Sport.  The Burkes had decided to tow the family's other car, a 1999 Ford Contour, on a tow dolly rented from a U-Haul rental center in Indianapolis.

On October 28, 2002, Mr. Burke rented a 102" tow dolly, which a U-Haul employee hooked to the ball hitch on his Explorer.  Initially, the trip to Florida was uneventful.  That afternoon, however, while the Burkes were driving in the rain on I-65 South near Elizabethtown, Christopher Burke experienced a sudden side-to-side, or fishtail, motion of the tow dolly and Contour as he headed into a slight left curve.  Burke testified that as soon as he became aware of the swaying, he saw the Contour slide perpendicular to the family's Explorer.  The right side of the Explorer immediately slammed into the guardrail and flipped over onto it.  The guardrail penetrated the roof of the Explorer causing severe injury to Mrs. Burke's cervical spine.  She is now a quadriplegic.  Their son, Ryan, sustained lacerations to his face.

These events resulted in the present lawsuit which alleges claims of strict liability and negligence against U-Haul and co-Defendant, Ford Motor Company.[2]  The central theory of liability offered by the Burkes' expert witnesses is that this unfortunate accident was caused by (1) a U-Haul rental policy that permits an unsafe 1:1 weight ratio between towing vehicle and towed vehicle, in combination with (2) the narrow wheel base and high center of gravity of the Explorer which makes it unreasonably prone to rollovers.  The expert witness report of Robert

---

[2] Ford is not involved in the current *Daubert* motions.

Anderson concludes that, "The tow dolly and Explorer combination with its unfavorable weight ratio was the cause of the accident. The combination did not allow reasonable levels of steering and braking." (DN 54, Ex. B, p. 3). The Burkes' other expert, Larry Barone, likewise concluded that the "unacceptable mass ratio" combined with the high center of gravity of the Ford Explorer, "produced lateral and directional dynamic instability with relatively minor steer input, thereby producing fishtailing (oscillation) of the vehicle and tow dolly combination which became more intensified with minor steering inputs causing the Ford Explorer to become uncontrollable." (DN 54, Ex. C, Attach. 1).

U-Haul's experts offer several contrary opinions. Expert Peter Broen concludes that the weight ratio of the Explorer/Contour vehicle combination was not only safe and well within the DOT guidelines and manufacturers' recommendations, but can be driven easily by an average driver (DN 204, Ex. B, p. 3, ¶ 5). Expert James Schultz opines that any "fishtailing" of the vehicle combination was not the result of a failure or defect in the equipment, but was the result of driver input (DN 204, Ex. A, p. 14).[3] The Burkes challenge both of these opinions under *Daubert*, as well as limited portions of the expert opinions of James Fait and Tyler Kress, Ph.D.[4]

---

[3] These opinions represent only a portion of the expert opinions offered by Peter Broen and James Schultz. The full expert report of each witness, along with those of Tyler Kress, Ph.D., and James Fait, may be found at DN 204, Exs. A-D. The Court will discuss the other disputed opinions of these experts when appropriate in the body of this order.

[4] U-Haul accompanied its motion to exclude the opinions, reports and findings of expert Larry Barone with a request for oral argument (DN 223). Certainly, the trial court may hear oral argument or conduct an evidentiary hearing in the proper circumstances, particularly when the record is not sufficient to permit a reasoned determination of the issues raised. *See, Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (discussing the latitude of the trial court when deciding how to test the reliability and relevance of an expert's testimony). Although the Court has discussed this matter somewhat at a recent conference, the current state of the record, however, simply does not require oral argument to fairly and thoughtfully dispose of the arguments raised. The Court has before it more than 150 pages of legal argument directly related to the parties' motions. The motion papers are accompanied by extensive affidavits, deposition excerpts, expert reports, maintenance records, charts, curriculum vitae, federal testing regulations, an engineering ethics code and grades transcript. Given this wealth of information and legal

II.

The admission or exclusion of expert testimony is a matter historically left to the broad

discretion of the trial court.  *Barnes v. Kerr Corp.*, 418 F.3d 583, 588 (6th Cir. 2005).  Rule 702

of the Federal Rules of Evidence provides the Court with the framework in which to exercise

such discretion.  Helpfulness of the proposed expert testimony should be the focus.  *See*, Becker

and Orenstein, *The Federal Rules of Evidence After Sixteen Years*, 147 F.R.D. 519, 537-38

(1992).  Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualifies as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  The federal district courts are the gatekeepers under this rule.  *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In *Daubert*, a majority of the Supreme Court held that the federal courts act as

gatekeepers to ensure that expert evidence is both reliable and relevant.  *Id.*  The Court explained

that the requirement that an expert testify to "scientific, technical or other specialized

knowledge" serves to establish a standard of evidentiary reliability or trustworthiness.  *Daubert*,

509 U.S. at 591.  The adjective "scientific" implies a grounding in the methods and procedures

of science, while the word "knowledge" connotes more than a mere subjective believe or

unsupported speculation.  *Id.* at 590.  Knowledge instead applies to a body of known facts, not

---

authority supplied to the Court, oral argument would not appreciably alter the substance or the outcome of the
Court's order applying Rule 702 and the *Daubert* decision.

known to a certainty, but information or ideas that can be derived by application of the scientific method so as to be supported by appropriate validation. *Id*. at 590*. See, Pride v. Bick Corp*., 218 F.3d 566, 576-78 (6th Cir. 2000) (discussing *Daubert*); *Nelson*, 243 F.3d at 250-51 (same).

No single criteria exists to determine whether a specific scientific method will be deemed reliable. *Pride,* 218 F.3d at 577. The court in *Daubert* has identified several flexible factors that should be taken into account when a court evaluates the scientific validity of expert testimony. These factors include: any testing that supports the challenged expert's hypothesis; peer review of the expert's methodology or publication of his or her test results; the known or probable rate of error associated with the methodology and whether it is generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94. These factors are non-exclusive. *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004).

Reliability is only the first element of the *Daubert* test. The second requires the federal court to determine whether the proposed expert testimony is relevant to the issues so that the fact finder will benefit in understanding the evidence or determining facts put at issue. *United States v. Langan*, 263 F.3d 613, 620-21 (6th Cir. 2001). This second part of the *Daubert* equation is sometimes referred to as the "fit" factor - - whether the proffered expert testimony fits the existing facts. *Pride*, 218 F.3d at 578. Once the court has determined that anticipated expert testimony is both reliable by validation and relevant to the facts of the case, the court must then consider whether the possible assistance to the jury will be offset by any fair prejudice resulting from the admission of the challenged testimony. *United States v. Beverly*, 369 F.3d at 528 ("If the evidence is deemed to be reliable and relevant, the judge must then determine if the probative value of the evidence is outweighed by its prejudicial effect.") (citing *Daubert*, 509 U.S. at 595).

This Court must first determine whether the offered witnesses are qualified to give expert testimony based on their "knowledge, skill, experience, training or education." Fed.R.Evid. 702. A prospective expert witness need not satisfy all of these five bases to qualify as an expert. Wright & Gold at § 6265 ("It is clear that a background in just one of these five may be sufficient."). *See, Knopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). The rule does not require that a witness be recognized as a leading authority in his or her field. The jury is responsible for comparing the professional stature of an expert witness with the stature of witnesses for the opposing party. Gaps in the qualifications or knowledge of an expert ordinarily run to the weight of the particular expert's testimony rather than its admissibility. In sum, trial courts are afforded broad discretion when deciding whether a witness will qualify as an expert under Rule 702. *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962).

III.

The Court first considers expert qualifications of the various challenged experts.

U-Haul argues that Robert Anderson cannot qualify as an expert, despite the liberal standard, because he lacks specific knowledge regarding the 102" model tow dolly at issue. U-Haul explains that Anderson cannot qualify because he has no professional experience in the design or manufacture of tow dollies and trailers. He is not a member of any towable equipment professional association of industry committee, has never authored any scholarly articles on towable equipment and apparently has no prior testing experience involving tow dollies. Because tow dollies are in U-Haul's view completely distinct from passenger vehicles, U-Haul concludes that the present situation is much like *Houchen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002), in which a trial court excluded an electrical control specialist as an expert

6

witness in a case involving the explosion of a printing press where the expert was not familiar with the controls of the particular press in question. This Court cannot agree.

Anderson's professional qualifications appear more than ample to permit him to testify on the subject of vehicle dynamics and accident reconstruction. The only question is whether this experience and his credentials transfer from the general field of vehicle accident reconstruction to the subject of vehicle accidents involving a tow dolly combination. The federal courts in a number of product liability cases involving engineering experts have permitted an expert witness with general knowledge to give expert testimony where the subject of that testimony related to such general knowledge but the expert had no specialized knowledge of the particular product. For example, in *DaSilva v. American Brands, Inc.,* 845 F.2d 356, 361 (1st Cir. 1988), the trial court properly permitted an expert qualified as a mechanical engineer to give an opinion on the safety of the design of an industrial mixing machine even though the witness had no design experience with the particular machine at issue. Anderson's qualifications appear similarly appropriate here.

U-Haul also challenges the qualification of Larry Barone. U-Haul argues that although Barone was employed in the engineering department at U-Haul from 1971 to 1983, and during that time helped design its prior 96" model tow dolly, he is not qualified to testify concerning the more recent 102" model because (1) he has not field tested a tow dolly for two decades nor has he worked in the tow dolly industry, (2) the 96" tow dolly has nothing to do with the Burkes' accident, and (3) he has no publications, professional memberships, continuing education or peer reviewed tests that involve the 102" tow dolly.

The Court has examined Barone's curriculum vitae along with his report. His education

7

includes a B.S. in Engineering Technology from Northern Arizona University in 1971.  Barone worked for U-Haul for over a decade in its Tempe, Arizona facility where he designed trailers and supervised vehicle testing for U-Haul trucks.  During the time he was employed by U-Haul, Barone and other U-Haul engineers designed and tested the 96" Demco model of tow dolly.  Their testing led to the U-Haul policy requiring a 2:1 weight ratio between the towing vehicle and the towed vehicle to ensure safety.  This ratio requirement remained in place until 1986,when U-Haul employee Abromovage reduced the weight ratio.  Abromovage testified in his deposition that he reduced the weight ratio based on performance of the U-Haul fleet at that time.  Therefore, U-Haul's current policy regarding weight ratio for the 102" model tow dolly originated from performance results of the earlier mid-1980s 96" model of tow dolly.  The same is true of U-Haul's policy regarding the absence of brakes on the 102" tow dolly.  Abromovage testified that his brake system analysis of 200 U-Haul tow dollies in 1986 convinced him that a brake system on the tow dollies then in service would be ineffective.  The model of tow dolly in effect at the time was the rigid 96" model tow dolly, another prior model.

Barone's professional experience in designing and testing the 96" model of tow dolly clearly is the type that readily falls within the provisions of Rule 702.  In fact, the current magistrate judge in a prior order entered on December 7, 2004, specifically found that the prior tow dolly models used by U-Haul are substantially similar to the 102" model so that the Plaintiffs were entitled to take discovery on the prior models.  Indeed, Barone's qualifications as an expert are  not somehow inadequate merely because while employed at U-Haul he gained extensive experience designing and testing the prior 96" model of tow dolly, a predecessor model that U-Haul tested in order to revise its 2:1 weight ratio policy in 1986.

8

U-Haul also attacks the qualifications of Barone based on an alleged overstatement of his educational accomplishments and his disqualification as an expert in one Texas case against U-Haul, the *Letzer* case.  The Court has carefully considered the serious allegations U-Haul levels against Barone, who has testified as an expert in cases involving U-Haul on many occasions.  The Court rejects outright the suggestion that Barone is in some fashion automatically disqualified merely because he does not hold a Kentucky engineering license under KRS 322.020(1)(a)(Michie 2001).  This statute was intended to protect the public in Kentucky from being preyed on by persons unqualified to render professional engineering services.  *Kennoy v. Graves*, 300 S.W.2d 568 (Ky. 1957).  The statute makes no mention, and has never been applied to, individuals' qualifications to testify in a Kentucky court.

Moreover, Barone has qualifications necessary to provide testimony.  Barone's lying or overstatements will certainly greatly damage his credibility.  Attacks on credibility fall within the province of the jury.  *Dixon v. Int'l Harvester*, 754 F.2d 573, 580 (5th Cir. 1985).  Accordingly, the jury may decide what weight it chooses to give Barone's testimony in light of his deposition.  His credibility, however, is not an appropriate basis on which to reject his otherwise adequate qualifications.[5]

The Burkes maintain that U-Haul's expert James Fait has stepped out of his area of expertise to render opinions on metallurgy involving damage to the retention bolt and ball clamp

---

[5]  The excerpt of the Letzer transcript provided by U-Haul also merits passing comment.  In the transcript, the Texas trial court notes that it would have ruled differently had a "different approach" been taken.  This observation suggests that the Texas court considered the matter of Barone's qualification a very close question.  Also to the extent that the court considered the absence of a professional license determinative, its decision to exclude Barone from qualifying as an expert runs contrary not only to the liberal spirit of Rule 702, but also the previously discussed state cases directly on point *against* disqualification in such circumstances.  Accordingly, the disqualification decision in Letzer has little precedential value in this instance.  Wright & Gold at Section 6264 (commenting that precedent on the admissibility of expert opinion may be of dubious value given the unique circumstances of individual cases).

on the tow dolly.  The Burkes insist that Fait's opinions not only exceed the scope of his expertise, but in certain respects, rely merely upon "high school geometry."  The Court's review of the excerpt of Fait's deposition and affidavit convinces it that Fait has not offered any opinion based upon metallurgy.  His opinions instead are based upon his experience in mechanical engineering.  The Court rejects these arguments to the extent that the Burkes question Fait's qualifications to render opinions upon the status of the retention bolt, ball clamp and coupler.

The Burkes also attack the qualifications of Tyler Kress, Ph.D., who during his deposition made a passing reference to "traumatic memory loss" as a possible neutral explanation for the inconsistency of the testimony of Corry and Christopher Burke.  The Burkes disagreed as to Corry's position in the vehicle at the time of the accident and on whether her seatbelt was buckled.  The Burkes maintain that Kress is not a medical doctor and therefore is precluded from offering a opinion on traumatic memory loss.

Dr. Kress declined to offer any opinion on whether Mrs. Burke suffered from traumatic memory loss.  His deposition testimony in this respect was simply a passing comment that offered a possible explanation for an otherwise material inconsistency in her testimony and that of her husband.  Further, the Court agrees that the Burkes have understated the professional qualifications of Kress who has obtained a Ph.D. in biomechanical engineering, has taken psychology classes and medical classes at the University of Louisville School of Medicine, and has testified in numerous accident cases.  Given that Kress had expressly denied expressing any opinion as to whether Corry Burke suffers from traumatic memory loss, the entire matter is now moot.

IV.

10

The Court now turns its focus to arguments about the methodology of the testing employed by the experts to arrive at their conclusions concerning the stability and safety of the vehicle towing combination.

U-Haul makes a determined challenge to Anderson's methodology. Anderson relied in part on a series of three vehicle tests known as the straight line braking test, the brake in turn test and the pulse reverse steer test to support his conclusions concerning the unfavorable weight ratio and inherent stability of the tow vehicle combination involved in the accident. U-Haul insists that the Court must now exclude the results of these tests because they are not the product of reliable principles and methods, nor are the tests sufficiently tied to the facts of the case.

Essentially, the theme of its attack is that Anderson "rigged" his tests in order to produce loss of control and jack knifing of the vehicle combination. As for the pulse steer test, U-Haul claims that this test, which is known as the "fish hook test" is normally performed on single vehicles to evaluate their rollover propensity, rather than loss of handling. Most importantly, U-Haul maintains that Anderson conducted all of the tests on the exemplar towing combination after disabling the anti-lock brake system (ABS) on the test vehicle.

The Court has examined Anderson's initial and supplemental expert reports. The vehicle testing that Anderson performed at Karco involved the same model of towing and towed vehicles, a 1993 Ford Explorer and 1999 Ford Contour. The testing procedure involved placing instruments on both vehicles to measure the steering wheel angle, brake pedal force, speed, throttle position, acceleration and rotation rates of both vehicles. The straight line braking, braking in turn and pulse steer or pulse reverse steer testing, was videotaped. The Ford Explorer

11

was tested both with and without a tow dolly attached.  Anderson also performed the same three tests using a 14 foot U-Haul truck with and without a Ford Contour in tow.

The question is whether these procedures were scientifically valid, not whether Anderson's conclusions based on his methodology were correct.  The Burkes' burden under *Daubert* in this respect is not one of perfection.  In other words, they need not convince the Court that the methodology employed by their expert is flawless in order to have his expert testimony admitted.  *See, Paoli R.R. Yard PCB Litigation*, 35 F.3d at 744.

The underlying methodology Anderson employed in his vehicle dynamics testing readily satisfies *Daubert*'s requirement of reliability.  In fact, Anderson employed two of the very same tests used by U-Haul's experts:  the straight line braking test and the pulse steer test.  His testing was fully documented and relied on principles of vehicle dynamics repeatedly used by experts in accident reconstruction.  The fact that Anderson may not have used the possibly more appropriate J2664 Trailer Sway Response Test rather than the "fish hook test" certainly does not render the methodology itself invalid.  What instead arises is the weight which the jury will assess when it considers Anderson's tests versus those performed by U-Haul's expert Peter Broen.

Further, the mere fact that certain aspects of the testing process may be considered partially subjective certainly is not a damning flaw that requires the Court to exclude Anderson's tests in toto.  If that were so, the Court would equally be compelled to exclude the over the road driving test performed by both James Schultz and Peter Broen as surely those tests have a

12

decidedly subjective component, as well.[6]  That the existence of a subjective aspect to testing

methodology is not per se grounds for exclusion of expert opinion as being unreliable.  *See, In re*

*MDL-731 Tax Refund Litigation*, 989 F.2d 1290, 1299 (2nd Cir. 1993).  The Sixth Circuit

explained that plaintiffs could not be required to establish "perfect identity between the

experimental and actual conditions...."  *Nimer*, 381 F.3d at 555 (citing *Guild v. General Motors*

*Corp.*, 53 F. Supp.2d 363, 366 (W.D. N.Y. 1999)).

A similar conclusion results from U-Haul's challenge to the validity of Anderson's tests

where the ABS on the test Ford Explorer was not functioning.  This distinction, according to

Anderson, would at most have only minimal effect on the results obtained by his testing.

Apparently, U-Haul's own expert Peter Broen during his deposition likewise testified that the

absence of a functioning ABS on the test Explorer would not have made much difference in the

outcome of certain of the tests conducted by Anderson.  The contrary conclusion by U-Haul's

expert James Schultz, who concluded that the absence of a functioning ABS rendered the test

results invalid, was itself not supported by any testing by Schultz to confirm his conclusions.

In sum, the absence of ABS is more appropriately a matter that the jury should consider

in assessing what persuasive weight is to be given to Anderson's test results.  His methodology

is sound, well documented and standard in vehicle dynamics testing.  Whether his conclusions

---

[6] For example, the expert report offered by Peter Broen includes the opinion that, "Driving this vehicle combination over the Burke accident roadway can be accomplished *easily* by an *average* driver."  (DN 204, Ex. B, p. 3, ¶ 4) (emphasis added).  The quoted language from Broen's report is substantially subjective as was the methodology employed by Broen to arrive at this particular conclusion.  If mere subjectiveness of itself were sufficient to undermine scientific validity, this conclusion would be inadmissible.  Indeed, the Court reserves its ruling on the admissibility of this opinion subject to further clarification of the terms "easily" and "average."

will find any traction with the jury is entirely another matter and one not to be preemptively determined by the Court.[7]

U-Haul also has challenged the reliability of the expert opinions offered by Larry Barone. U-Haul insists that Barone, like Anderson, relied upon flawed reasoning and unreliable data.  In fact, U-Haul points out that Barone conducted no independent testing and relied only on the test results of Anderson, along with his experience in designing and testing the 96" tow dolly in the early 1980s.

The Court has already examined Anderson's methodology for the three tests administered at the Karco vehicle testing facility.  Barone's expert opinions are not poisoned merely because he relies upon Anderson's test results.  Anderson's testing has sufficient scientific validity to be reliable and therefore Barone's reliance on such testing is not grounds for exclusion of Barone's opinions under *Daubert*.  Additionally, both Anderson and Barone rely on more than vehicle testing as a basis for their conclusions.

Barone was directly involved in designing and testing the 96" U-Haul tow dolly, one of the predecessors to the 102" model tow dolly.  While the prior magistrate judge found these two models of tow dollies to be dissimilar, that decision was subsequently reversed by the current magistrate judge involved in the case.  This Court affirmed the conclusion of the magistrate judge that the prior models of U-Haul tow dollies were sufficiently similar to justify discovery

---

[7] U-Haul is adamant in its motion papers that the ABS on the exemplar Explorer was intentionally disengaged in order to ensure loss of control and jack knifing. The record reveals that the Ford Explorer used in the test was sent to a local automobile dealership for a complete inspection of its major systems, including the brakes, prior to the testing.  Anderson when questioned about the matter had no knowledge on how the ABS system, which was presumably checked at the dealership, became disengaged prior to the testing.  Neither party has offered any witness from the dealership to confirm that the ABS was actually inspected and that it was functioning at the time the vehicle left the dealership for the Karco test facility.  The Court itself draws no conclusions as to whether the ABS was intentionally disconnected in order to influence the outcome of the test results.  Once again, this dispute is a matter for the jury to weigh in evaluating the persuasiveness of Anderson's expert testimony.

14

about them.  Accordingly, the Court does not reject the validity of Barone's expert opinions merely because they are based in part on testing involving a prior model of two dolly.  Likewise, the fact that U-Haul's expert Broen disagrees with Barone on virtually every point is not grounds to exclude Barone's expert opinion.  It would be the rare case that experts for opposing parties do not disagree on the material aspects of their opinions.  If that were grounds for exclusion, then the Court would be forced to exclude *both* experts' opinions.

The Court agrees with U-Haul that Barone's opinion concerning pre-existing damage to the tow dolly from a possible accident prior to the time that the Burkes rented the tow dolly is potentially excludable.  Barone did examine the tow dolly and his examination does appear to be the basis for such opinion.  During his deposition, however, Barone stated merely that his conclusion concerning prior accident damage was based on a "feeling" and that metallurgical testing would be needed to confirm his view on this issue.  No such testing has been performed.  Nevertheless, the Burkes insist that Barone's opinion in this regard is based on his inspection and forensic analysis of the tow dolly, a tear down of an exemplar tow dolly, review and inspection of the repair records of the tow dolly, along with the safety certification policy of U-Haul.  If so, Barone's opinion on pre-existing damage to the rented tow dolly may well have sufficient basis to be valid and therefore admissible.

The Court will reserve its judgment and await the development of testimony at trial before ruling conclusively on whether Barone will be permitted to express a view on pre-existing damage to the tow dolly.  In all other respects, the Court is comfortable in concluding that a sufficient and valid basis exists so as to render Barone's opinions sufficiently reliable under *Daubert* to be admissible.

15

The Burkes challenge the reliability of certain "drive through" tests performed by U-Haul's experts, James Schultz and Peter Broen.  Based on his drive through testing, Schultz concluded that even at speeds up to 75 m.p.h., the lateral acceleration of the towing combination never reached the coefficient of  friction such that the towed vehicle would sway out of control.  Broen concluded that the vehicle combination could be driven "easily by an average driver."  The Burkes now attack these opinions as purely subjective and performed under dissimilar circumstances on a day when the roadway was dry and the weather sunny, unlike the day of the accident.  Citing *Fusco v. GM*, 11 F.3d 259 (1st Cir. 1993) and *Gladhill v. GM Corp.*, 743 F.2d 1049 (4th Cir. 1988), the Burkes conclude that the drive throughs are inadmissible given the dissimiliarity of the circumstances.

The Court has previously expressed its view concerning subjectivity and its impact on the admissibility of expert opinion.  The presence of a subjective element in otherwise scientifically valid testing is not of itself grounds for automatic exclusion.  On this point, the Court notes that the drive through testing performed by Schultz had a definite objective component and employed instrumentation to measure the lateral force on the towing combination at varying speeds to determine if that force would exceed the coefficient of friction.  These circumstances adequately distinguish the drive through testing performed by Schultz from *Fusco* and *Gladhill*.

The Court, on the other hand, reserves its ruling on the admissibility of Peter Broen's conclusion, based on his drive throughs, that the same vehicle combination can be driven easily by an average driver over the road where the Burke accident occurred.  Although Broen attempts to paint this opinion as an affirmation of his prior objective testing, the Court has difficulty with his purely subjective conclusion, and in particular, with its terminology relating to the "average

16

driver" and the "ease" with which the vehicle combination can be drive.  The Court will await Broen's testimony to clarify and give substance to these terms.[8]

V.

U-Haul also challenges the expert opinions of Anderson and Barone based on <u>Daubert</u>'s requirement of relevancy, the "fit" requirement that mandates an expert's conclusions relate to the facts of the case.  In its motions to exclude, U-Haul argues that Anderson's tests are not relevant because they did not duplicate the actual driving input of Christopher Burke, nor the road conditions at the time of the accident.

In *Daubert*, 509 U.S. at 591, the court explained that, "Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'  This condition goes primarily to relevance."  The Sixth Circuit has echoed the same understanding about the relevancy requirement.  *Nelson*, 243 F.3d at 251 ("A district court is not required to admit expert testimony 'that is connected to existing data only by the *ipsi dixit* of the expert.  A court may conclude that there simply is too great an analytical gap between the data and the opinion offered.'") (citing *Daubert* 522 U.S. at 146)); Wright & Gold at § 6264 ("[E]xpert testimony does not 'assist' if it is unrelated to facts at issue.").

The Court has examined the circumstances surrounding the accident as set forth in those portions of the depositions available and the expert reports filed in the record.  The expert report of James Schultz refers to the observations of eyewitnesses driving behind the Burkes on the day

---

[8]  At present, the Court in unclear what Broen means by "average driver."  Presumably, he is not referring to the dimensions of the driver, *i.e.*, height, weight or strength.  More likely, Broen's reference is to a driver similar in age and driving experience to Christopher Burke.  Likewise, the term "accomplished easily" presumably is not intended to mean without mental or physical effort.  More likely, the quoted term is intended to imply that the route can be driven safely by a driver with similar skill level to that of Christopher Burke.  As noted, the Court will await testimony at trial to rule conclusively on this opinion of expert Broen.

17

of the accident (DN 204, Ex. A, pp.9-10). According to Schultz, these witnesses observed

multiple back and forth movements as well as illumination of the brake lights on the Burkes'

vehicle as it lost control.  In the words of Schultz:

> I know of only one explanation to cause the Contour to out-track
> under the conditions that existed at the time of the accident.  To
> out-track, it requires there had to have been a series of reverse
> steering maneuvers made by Mr. Burke.  The witness testimony
> stated multiple back and forth movements were observed.  The
> steering maneuvers would have been caused solely by an
> inappropriate turning of the steering wheel by the operator.  By
> simply turning the steering wheel first in one direction followed by
> a quick reversal one, or more than one time, the Contour could be
> made to out-track.  According to witnesses, there were several
> swerves back and forth.  If brakes were forcibly applied during the
> time of out-tracking, that would only exacerbate the amount and
> severity of out-tracking.
>
> According to Ronald Still [an eyewitness], after several swerves,
> the Explorer turned real hard.  According to Eric Marshall [another
> eyewitness], the Contour came halfway into the number one lane
> before going off to the right-hand side.  As it turned to the right,
> the witnesses observed the brake lights illuminate which all agreed
> Burke should not have done.

(DN 204, pp. 9-10).

Schultz's expert report and the deposition testimony summarized therein convinces this

Court that Anderson's braking and steering tests are not divorced from the facts of the accident.

The eyewitnesses following the Burkes' vehicles reported multiple back and forth movements

which Schultz concluded would have been caused solely by inappropriate turning of the steering

wheel.  The same witnesses saw the brake lights activated on the vehicle at the same time.

Therefore, Christopher Burke may not have applied the brakes or engaged in any severe steering

18

maneuvers immediately *prior* to the time the Contour began to sway out of control, he almost certainly did so immediately thereafter as the accident was in the process of occurring.

These facts persuade the Court that the testing performed by Anderson "fits" the circumstances as they occurred at the time of the accident. Anderson's test results therefore are relevant along with the conclusions arising therefrom. For the same reason, the Court rejects the Burkes' own argument that the drive-through testing fails on grounds of relevance apart from its reliability. Although the roadway was not wet when Peter Broen and James Schultz conducted their drive through testing, the remaining conditions were identical to matters as they existed on the day of the accident. The jury may determine the significance of the fact that it had been raining on the day of the accident. This sole dissimilarity does not create so great an "analytical gap" between the data and the opinions offered that the jury would not be assisted by the expert testimony of the challenged experts.

VI.

The final evidentiary question the Court must address is whether the relevance of the challenged expert testimony is outweighed by any unfair prejudice so as to require exclusion pursuant to Rule 403 of the Federal Rules of Evidence. Rule 403 provides in material part that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury...." Fed.R.Evid. 403. *See*, *Alley v. Bell*, 307 F.3d 380, 396 (6th Cir. 2002).

Here, the Court cannot say that the danger of unfair prejudice or confusion clearly outweighs the probative value of the expert testimony discussed in this order. While certain of the expert opinions offered may well be subject to substantial attack for any of a number of

reasons, they are sufficiently reliable and relevant to assist the trier of fact in understanding the issues raised. The parties will have ample opportunity to explore whatever deficiencies may exist in the expert opinions offered by an opposing party. The Court essentially concludes that any such defects are a matter for the jury to weigh.

As *Daubert* notes, "[V]igorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; Wright & Gold at § 6264 (While trial courts must exercise more vigorous gatekeeping functions when confronted with scientific evidence, "courts usually conclude that defects in the underlying logic or basis of expert testimony are jury questions that go to weight, not admissibility.") (collecting cases). *See also*, *Bonds*, 12 F.3d at 563 ("[C]riticisms touching on whether the lab made mistakes in arriving at its results are for the jury."); *Barreto,* 268 F.3d at 334 ("*Daubert* ... [is] a case intended to relax the admissibility requirements for expert scientific evidence....").

VII.

U-Haul has also moved for summary judgment based upon the anticipated successes of its *Daubert* motions. To the extent the motions rely upon the *Daubert* motions, they must be denied.

The one aspect of the motion unrelated to the expert testimony is U-Haul's request for dismissal of the punitive damage claim. The Court has expressed its opinion that establishing gross negligence will be difficult. However, the record is not so clear on that issue that summary judgment is appropriate.

Being otherwise sufficiently advised,

20

IT IS HEREBY ORDERED that all of the *Daubert* motions now pending are DENIED, except that the Court reserves its ruling about the extent of the Barone's opinion that the tow dolly in question was damaged in a prior accident and Broen's opinion that an average driver could easily drive the same vehicle combination that was driven by the Burkes over the roadway where the accident occurred.

IT IS FURTHER ORDERED that all other related motions are MOOT.

IT IS FURTHER ORDERED that U-Haul's motion for summary judgment is DENIED.

Copies to Counsel of Record